STATE, EX REL. WILLIAM L. CHADWICK, A JUSTICE OF THE PEACE OF THE COUNTY OF OCEAN, v. WILLIAM ERRICKSON, CLERK OF THE COUNTY OF OCEAN.

1. Under the act respecting coroners, (*Rev.*, *p.* 169,) a justice of the peace is only authorized to act as coroner when a coroner cannot be had in due time to take the inquest.

2. If the condition of a dead body should be such that it be manifestly improper, in the judgment of ordinary men, to defer its burial long enough to notify a coroner, in such a case a justice would be unquestionably authorized to act, and be entitled to receive the fees allowed by the statute.

3. The fact that a justice may be more conveniently located; that he has received the first notice; that he has performed, in good faith, the first official act, believing that a coroner could not be had in due time —no one of these facts, nor all of them together, will authorize a justice to act when it plainly appears a coroner might have been had in due time.

4. When a body required almost immediate burial, and a justice has taken charge of it for that purpose, a coroner appearing before it has been finally disposed of, may, at his option, assume control of it, and have the costs taxed and receive them from the treasurer. The justice would be entitled only to receive from the coroner reasonable compensation for services rendered before the coroner arrived.

On rule to show cause why a *mandamus* should not issue, &c.

Argued at November Term, 1877, before Justices DAL-
RIMPLE and WOODHULL.

For the rule, *George C. Beekman.*

*Contra, Thos. W. Middleton.*

The opinion of the court was delivered by

WOODHULL, J.   The relator obtained a rule requiring the
respondent to show cause why a writ of *mandamus* should not
be issued, commanding him, as clerk of the county of Ocean,
to tax the bills of the relator for his services as acting coroner,
in taking charge of and burying six bodies cast ashore from
the wreck of the schooner " Margaret and Lucy," on the night
of March 2d, 1877, and to take his affidavit to each of said
bills of cost, in accordance with the provisions of the twenty-
sixth and twenty-seventh sections of the act entitled "An act
respecting coroners."  *Rev., p.* 169.

The case made by the relator, in his affidavit and petition
for the rule, is, in substance, that he is a justice of the peace,
duly commissioned and qualified, residing near Point Pleasant,
in the township of Brick, in the county of Ocean; that on
the evening of March 2d, 1877, the three-masted schooner
" Margaret and Lucy " was stranded and totally wrecked on
Squan Beach, in said county, with the loss of all on board;
that, as there was no coroner nearer than Toms River, the
relator, as justice of the peace, was notified by William P.
Chadwick to come and take charge of the body of one of the
shipwrecked crew, and was afterwards notified by different
persons of five other bodies which had been washed ashore
from the wreck; that he, acting as coroner, took charge of
these bodies, removed them to his house, and buried them;
that having made out the written statement required by the
sixteenth section of the act, and a separate certificate as to each
body, in accordance with the provisions of the sixth section,

and having fulfilled all the other requirements of the act, he presented to the respondent, at his office in Toms River, on the 5th day of April, 1877, the said statement and certificates, with the bills of cost annexed, requesting him to tax the costs and fees allowed by law in such cases, and that the respondent refused and still refuses to do so.

The respondent's reasons for this refusal are fully stated by himself, in his testimony taken in the cause. He says, " I am clerk of the county of Ocean; in March last, I taxed a bill of costs and expenses for John Klippel, coroner; I know it was (as reported) for services for view of the bodies of crew of the schooner 'Margaret and Lucy;' I am acquainted with William L. Chadwick, the relator; he requested me to tax a bill for costs and expenses for these bodies; I did not tax it; I gave him the reason why I did not; I told him I had already taxed the same bills for Coroner John Klippel, in which his fees were allowed for the burial of the dead bodies; Esquire Chadwick never protested against my taxing the bills of Coroner Klippel; several days before Chadwick presented his bills to me, Coroner Klippel informed me that those bills had been paid by the state, and that he, Klippel, was ready to settle with Chadwick; I refused to tax the bills of Esquire Chadwick, also, to avoid complication, fearing that the matter might be overlooked, for the time being, by the state treasurer, and the bills paid under the impression that the taxing covered separate and distinct cases of drowning, and my refusing to tax Esquire Chadwick's bills I knew would be one effectual method of drawing the attention of the treasurer to the fact that these same bills had been presented by the coroner, and paid."

It is apparent, from the foregoing testimony, that the real controversy in this case is not between the relator and the respondent, but between the relator and John Klippel, one of the coroners of the county of Ocean.

It is further evident that the merits of this unfortunate controversy cannot be understood—much less satisfactorily determined—without examining the facts which serve to con-

nect the coroner, Klippel, with the services in question, and which, on the part of the respondent, are relied on to show that, in legal effect, those services were performed, not by the relator, as acting coroner, but by the actual coroner, John Klippel.

It appears, from the testimony of William P. Chadwick, who was captain of the crew of life-saving station number twelve, that one of the six bodies was found about four o'clock in the morning of March 3d, within the limits of his district, and about four miles north of the place where the schooner struck. He sent a verbal notice of the finding of this body to Point Pleasant, supposing there was a coroner at that place, instructing his messenger, however, in case there was not, to notify a justice of the peace.

The relator, having received this notice, as he states, about ten o'clock A. M. of March 3d, drove down to station number twelve, some eight miles south of Point Pleasant, took charge there of the body, at four o'clock P. M. of the same day, and conveyed it to his residence at Point Pleasant.

After sending a messenger to Point Pleasant, as just stated, Captain Chadwick, having ascertained that there was no coroner residing at that place, and that there was one—John Klippel—at Toms River, station number twelve being not far from midway between the two places, sent another messenger to him, with a notice, in writing, stating that he had found one of the crew of the wrecked schooner, and requesting him to come and attend to the body as soon as possible, at his station.

In about an hour after this notice had been sent to Klippel, the relator arrived and took charge of the body, without objection on the part of Captain Chadwick. Upon being informed of the notice which had been sent to Coroner Klippel, the relator replied "that as long as he had been notified and got the word first, he should take the body."

The notice sent to the coroner, as above stated, was received by him about ten o'clock P. M. of the same day, and the next morning, as early as the weather would permit, he started by

boat for station number twelve, arriving there at eleven o'clock A. M. Finding that the body he had come to take charge of had been removed as already stated, he proceeded without delay to the residence of the relator, at Point Pleasant, where he found it, with five other bodies. Of the finding of two of the five, he had been informed by the messenger who brought him the notice. As to the other three, he does not appear to have had any previous information.

Believing it to be his duty, under the circumstances, to take some action, as coroner, respecting these bodies, he at first proposed to take charge of them with the relator, and that they should divide the fees. This proposition being rejected by the relator, the alternative was presented to him, either to accept it, or to permit the coroner to take charge of them. He refused to do either.

This was in the afternoon of Sunday, March 4th. The next morning, the coroner came up again, as he had informed the relator he would, after taking advice, and again formally demanded the bodies, but without effect—three of them having been already buried.

The coroner, while at the residence of the relator, on Sunday, viewed the bodies, and took the description of them. About two weeks after this, and before the relator had applied for that purpose, he had his bills taxed by the respondent, and obtained the amount of them from the state treasurer. He has also paid all bills for expenses incurred in burying these bodies, excepting the bill of the relator, and has expressed his readiness to pay that, whenever presented.

Unless the relator can show that, under the circumstances appearing in this case, he was legally entitled to view and take charge of the six bodies in question, and to secure the fees and costs allowed by law therefor, to the entire exclusion of the coroner, John Klippel, he cannot succeed in this application. Whether or not he was so entitled depends upon the true meaning of those provisions of the act respecting coroners, which were designed to ascertain the relative rights and duties of coroners and justices of the peace in such cases.

Paragraph sixteen provides that in all cases where dead bodies shall be thrown upon any of the shores or coasts of this state, by shipwreck, the coroner or coroners of the county in which the said bodies shall be found shall make out a written statement, containing the name of the ship, the date of the wreck, &c.

In this paragraph, it will be observed, no mention at all is made of justices of the peace. The following paragraph, however, the seventeenth, enacts that if it shall, at any time hereafter, so happen that a coroner or justice of the peace cannot be had in due time to take charge of any dead body thrown upon any of the shores or coasts of this state, by shipwreck, then and in such case, and under such circumstances only, it shall be the duty of each and every commissioner of wrecks, in the district where any such dead bodies are found, to do all and every thing and things in manner and form as required of a coroner to do in the premises, &c.

The language of this paragraph, although conferring no authority upon justices of the peace directly, would seem to imply an authority in those officers to do whatever, by the terms of the preceding paragraph, may be done by the coroners. These two paragraphs, the sixteenth and seventeenth, taken together and without reference to any other part of the act, might, fairly enough, be understood to mean that, with respect to dead bodies thrown upon the shore by shipwreck, coroners and justices of the peace should have concurrent and equal authority, so that the officer, whether justice or coroner, who should do the first official act in a given case, should, at his option, assume the entire control of it, to the exclusion of the other.

But I am unable to accept this as the true meaning of the act. To reach that, the two paragraphs just referred to must be read and interpreted in connection with placitum four of the same act, which provides that if it shall, at any time hereafter, so happen that a coroner cannot be had in due time to take inquests of deaths in prison, or any violent, sudden or casual deaths within his county, then and in such case it shall

Chadwick v. Errickson.

be the duty of any justice of the peace in the county where such death may happen, or dead body be found, on notice thereof, to do all and every thing and things, in manner and form which is required of a coroner to do in the premises, &c.

This paragraph prescribes the conditions under which a justice of the peace may act as coroner, just as placitum seventeen prescribes the conditions under which a commissioner of wrecks may act in that capacity.

If a coroner cannot be had in due time, then a justice of the peace may act; if neither a coroner nor a justice of the peace can be had in due time, then a commissioner of wrecks may act as coroner; and conversely, if, in a given case, a coroner can be had in due time, a justice of the peace has no right to act; and if, in a given case, either a coroner or a justice of the peace can be had in due time, a commissioner of wrecks has no right to act as coroner.

In order, therefore, to determine whether a justice of the peace was authorized to act as coroner in a particular case, it is essential to ascertain, in the first place, as a matter of fact, whether a coroner *could have been had in due time*, in the sense of the statute.

These words must of course receive a reasonable construction, with reference to all the circumstances of the particular case. If the condition of a dead body, when found, should be such that it would be manifestly improper, in the judgment of ordinary men, to defer its burial long enough to notify a coroner, in such a case a justice would unquestionably be authorized to act, and upon presenting satisfactory proof of the circumstances which rendered it necessary for him to do so, would be entitled to have his costs taxed by the clerk.

But the fact that a justice may be more conveniently notified than a coroner; that he has received the first notice; that he has, in good faith, performed the first official act, believing that a coroner could not be had in due time—no one of these facts, nor all of them together, will be sufficient to authorize a justice to act, where it plainly appears that a

coroner might have been had in due time, in the sense just stated.

Even in the case supposed, where the condition of the body plainly required almost immediate burial, and the justice has taken charge of it for that purpose, a coroner appearing before it has been finally disposed of, may, at his option, assume control of it, in which case he, and not the justice, would be entitled to have the costs taxed, and to receive them from the treasurer. All that the justice would be entitled to, in such a case, would be to receive from the coroner a reasonable compensation for the services rendered by him before the coroner arrived.

This interpretation satisfies both the language and the spirit. of the act. It gives effect at once to the provisions designed to guard against improper delay, &c., and those which, by establishing a due subordination amongst the officers referred to, were intended to guard against, and, as far as practicable, to prevent unseemly competition and indecorous haste in the performance of the sad duties required of them.

Rule to show cause discharged, with costs.